1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVEN MURPHY,

                       Petitioner,

      v.

DEPARTMENT OF CORRECTIONS AND
REHABILITATION and KATHY
MENDOZA-POWERS, Warden,

                    Respondents.

_____/

No. C 06-04956 MHP

**MEMORANDUM & ORDER**
**Re: Petition for Writ of Habeas Corpus**

      Petitioner Steven Murphy, a California prisoner currently incarcerated at Avenal State Prison
in Avenal, California, petitions for a writ of habeas corpus pursuant to 28 U.S.C. section 2254.
Murphy asks that this court direct respondents to: (1) dismiss the prison disciplinary board's
decision finding him guilty of a disciplinary violation as well as any references to the same; and (2)
expunge the associated disciplinary charges.  His petition is now before the court for review
pursuant to 28 U.S.C. section 2243 and Rule 4 of the Rules Governing Section 2254 Cases.

BACKGROUND[1]

      Murphy, currently serving an indeterminate fifteen-year-to-life sentence for second degree
murder, is challenging a prison disciplinary board decision which found he violated California Code
of Regulations ("CCR") section 3005(a) by attempting to undermine the Catholic Chapel Program
("CCP") at the California Men's Colony where he was incarcerated.

Murphy, along with several other inmates—David Dutra, James Marvin, Benny Ros, and Gerald Shil ("alleged co-conspirators")[2]—were long-term participants in the CCP under the direction of Father Alphonse Van Guilder.  Father Alphonse retired in January 1999.  Twenty-two months later, in November 2000, Father R. Francis Stevenson was hired as the Catholic Chaplain for the CCP.  Murphy had been active in the CCP for several years as a parishioner, commentator, lector and volunteer.  Nevertheless, soon after Father Stevenson's arrival, in May 2001, Murphy quit the CCP.

While volunteering with the CCP, Murphy and the alleged co-conspirators enjoyed considerable freedom at the chapel office, where they were unsupervised during the approximately twenty-two month period prior to Father Stevenson's arrival.  See Ans. at 2.  Murphy and the alleged co-conspirators controlled the flow of paperwork in the chapel office, which permitted them to control which inmates were able to have outside visitors attend family services.  Id.  Some of the alleged co-conspirators also used the chapel bathroom for trysts with their wives and stole food from the family service banquets to sell on the yard.  Id.

After his arrival, Father Stevenson prohibited Murphy and the alleged co-conspirators from using the chapel office without supervision.  Id.  In response, Murphy and the alleged co-conspirators became angry and began to agitate other inmates in an effort to decrease participation in the CCP.  Id. at 2–3.  They also began making threatening statements.  Id.  This behavior persisted over a period of months, during which time Murphy and the alleged co-conspirators discouraged participation in the CCP in a coordinated effort to have Father Stevenson removed.  Altnow Dec. (hereinafter "Docket No. 14"), Exh. K at 7.  Matters reached a critical point when fellow inmates began to feel that Murphy and the alleged co-conspirators had "crossed the line" by promising to "take [Father Stevenson] down."  Id.

Murphy contends that Father Stevenson altered the style of the CCP "from a conventional style that conformed to Catholic tradition and belief to an unorthodox, militaristic program . . . contrary to Catholic dictates and tradition."  Pet. at 4.  Murphy states that his decision to withdraw from the program was a direct result of the changes made by Father Stevenson and that this decision

1    was individual, made on the basis of personal beliefs and feelings about the program.

2        The alleged co-conspirators also withdrew from the program during the same period.

3    Murphy states that he "did not conspire, agree, or even consult with" the other inmates in their

4    individualized decisions to dissociate themselves with Father Stevenson and the CCP. Id. at 5. To

5    this end, he argues that over 100 other inmates withdrew from the program during Father

6    Stevenson's tenure. In February 2003, Father Stevenson was transferred to another prison.

7        On January 2, 2002 Murphy and the alleged co-conspirators were placed in administrative

8    segregation and charged with disciplinary violations. They were charged with conspiring to:

9    (1) dissuade the free participation of the other inmates in the Catholic religious program; (2) make

10    statements of a threatening nature against Father Stevenson; and (3) negatively affect the

11    employment of Father Stevenson. Ans., Exh. D at 1.

12        Murphy requested an investigative employee ("IE") and, on February 11, 2002, Correctional

13    Officer P.M. Kreitler was assigned to assist him with his disciplinary hearing. Id. at 4. Murphy

14    stated that he had no objections to Officer Kreitler serving as his IE. Id. Subsequently, Officer

15    Kreitler interviewed Murphy, Father Stevenson, Lieutenant Wiley, and an inmate witness, Oscar

16    Cliffton. Id. at 5. At the conclusion of his report, dated February 14, 2002, Officer Kreitler

17    indicated that Murphy had requested the presence of Lieutenant Wiley and inmate Cliffton at his

18    hearing. Id. at 5.

19        Prior to his hearing, Murphy was notified that confidential material was being considered

20    and he was given a summary of the confidential information. Docket No. 14, Exh. I at 1–2. This

21    material was compiled in a written report based on an internal investigation conducted by Lieutenant

22    Wiley ("Wiley Report"). Ans. at 2–3. It was based in part on Wiley's interviews with staff and

23    inmates. Id. at 2. In his report, Wiley concluded that Murphy had joined a conspiracy to undermine

24    attendance at the Catholic Chapel service. Id. The report also found that Murphy and the alleged

25    co-conspirators had threatened Father Stevenson. Id. The Wiley Report was kept confidential

26    during the disciplinary proceeding because it was determined that this information, if known to

27    Murphy, would jeopardize the safety of the informants. Docket No. 14, Exh. D at 2.

28

In March 2002 Murphy received a prison disciplinary hearing. Ans. at 2. At the hearing, Murphy acknowledged that he had received copies of the charges and all pertinent documents at least twenty-four hours prior to the hearing. Docket No. 14, Exh. D at 1. Murphy did not request any additional materials at the hearing. Id. Although Murphy had initially requested that two witnesses be present, the Senior Hearing Officer's notes indicate that he revoked his request at the time of the hearing. See id. At the outset, the Senior Hearing Officer advised Murphy that confidential information would be considered, that the identity of the confidential inmates would not be divulged and that the confidential information provided had been scrutinized and determined to be reliable under CCR section 3321(c). Id. at 3. The Senior Hearing Officer explained the consequences of a finding of guilt and the Rules Violation Report was read aloud. Id. at 1. Murphy stated that he was in good health and ready to proceed with the hearing. Id. After the hearing, Murphy was found guilty of the disciplinary charge of attempting to undermine the CCP, id. at 3, even though Murphy had not received a disciplinary infraction in over twenty years.

On March 7, 2007 the Board of Parole Hearings ("the Board") denied Murphy parole. Ans. at 3. The Board commended Murphy for graduating from high school, taking college courses, completing a radiologic technician vocation, serving as a porter on a work crew, working as an aid to both social service and medial patients, and for his almost continuous involvement in Alcoholics Anonymous and Narcotics Anonymous while incarcerated. Docket No. 14, Exh. J at 3. In rendering its decision, however, the Board emphasized that the commitment offense had been "carried out in an especially cruel and callous manner." Id. at 1. The Board also expressed concern that the "offense was carried out dispassionately." Id. at 2. Specifically, the Board noted that petitioner attacked a "particularly vulnerable" victim who was partially blind and living alone. Id. at 1. The Board further recounted how the victim was forced against the bed, his pockets turned out and torn, and strangled to death. Id. at 1–2. The Board also described the abuse and mutilation of the victim's body, including a two inch gash on his skull, a three inch laceration at the base of his neck and a second stab wound in the mid-right portion of his back. Id. at 2. Discussing Murphy's rehabilitation, the Board quoted his probation evaluation which determined that "correction services

4

have been of no benefit whatsoever . . . and his cool, calm demeanor appeared to indicate that he's devoid of any feeling regarding the victim." Id. The Board concluded by referring to Murphy's history of criminal behavior, escalated pattern of criminal conduct and poor institutional behavior, including the disciplinary violation which is the subject of this petition. Id. Upon these grounds, the Board denied Murphy's parole for a term of two years.

Murphy sought relief in the California courts regarding his disciplinary violation. The San Luis Obispo County Superior Court denied his petition for a writ of habeas corpus on January 14, 2004 in a reasoned order. Docket No. 14, Exh. K at 8. The California Court of Appeal summarily denied his petition for a writ of habeas corpus and the California Supreme Court summarily denied his petition for review. Murphy then filed this federal petition for a writ of habeas corpus. Respondent answered and Murphy filed a traverse. The matter is now ready for a decision on the merits.

The parties present two broad issues that the court will address in turn. First, respondent argues that Murphy failed to properly invoke this court's federal habeas jurisdiction because he cannot establish that expungement of his prison disciplinary violation is "likely" to accelerate his eligibility for parole. Second, assuming that he can establish habeas jurisdiction, Murphy argues that he was not afforded due process when the prison disciplinary board found him guilty of attempting to undermine the CCP because: (1) they failed to disclose the confidential Wiley Report; and (2) the evidence relied upon did not meet the "some evidence" standard.

JURISDICTION AND VENUE

A petition for a writ of habeas corpus made by a person in custody under the judgment and sentence of a state court of a state which contains two or more federal judicial districts may be filed in either the district of confinement or the district of conviction. See 28 U.S.C. § 2241(d). Each of such districts shall have concurrent jurisdiction to entertain the petition; however, the district court for the district where the petition is filed may transfer the petition to the other district in the furtherance of justice. See id. Murphy is currently incarcerated in Avenal State Prison in Avenal,

5

California, which is in the Eastern District of California. Although the record is silent on the matter, it appears that Murphy was convicted for the underlying offense in Los Angeles, California, which is in the Central District of California. Thus, venue does not lie for either of the statutory grounds described above. Respondents, however, have not challenged venue and, hence, the objection is waived. Moreover, venue stands because this action came before this court along with the petitions of the alleged co-conspirators and is being addressed on the papers, with no need for an evidentiary hearing. Consequently, principles of judicial economy and consistency dictate that this court is the proper venue in which to address petitioner's claims.

EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), ©. The parties do not dispute that state court remedies were exhausted for the claims asserted in this petition.

LEGAL STANDARD

This court is required to analyze state habeas corpus claims under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that this court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Specifically, 28 U.S.C. section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126–27 (9th Cir. 2006). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim resulted in a decision that was: (1) "contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Supreme Court has interpreted AEDPA to require a district court to uphold the state court's decision unless that decision was an objectively unreasonable application of a clearly established federal law. Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

Accordingly, this court will review the last reasoned state court opinion under the standards outlined in AEDPA. See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006). Here, the last reasoned state court opinion occurred in the California Superior Court for the County of San Luis Obispo ("Superior Court"). This court will apply the AEDPA standard to the Superior Court proceeding to determine whether it was an "objectively unreasonable" denial of parole.

DISCUSSION

Before the Superior Court, Murphy asserted multiple claims in support of his petition for a writ of habeas corpus. The Superior Court, however, considered only three of Murphy's claims, stating that "[s]ince these were the only bases on which [Murphy] exhausted [his] administrative remedies, these are the only bases [he] may pursue on habeas corpus." Docket No. 14, Exh. K at 4. This court agrees. Murphy now asserts only two of those claims.[3] Specifically, the court will address Murphy's claims that his right to due process was violated because: (1) the Senior Hearing Officer failed to disclose the confidential Wiley Report; and (2) there was insufficient evidence to support the committee's decision. Before addressing the merits of Murphy's claims, however, the court must first determine whether petitioner has properly invoked this court's jurisdiction.

I.    Federal Habeas Corpus Jurisdiction

A writ of habeas corpus is the appropriate federal remedy when "a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a

7

determination that he is entitled to an immediate *or speedier* release from that imprisonment." Preiser v. Rodriguez, 411 U.S. 475, 500 (1973) (emphasis added). Federal habeas corpus jurisdiction is available to a prisoner seeking "expungement of a disciplinary finding from his record if expungement *is likely* to accelerate the prisoner's eligibility for parole." Bostic v. Carlson, 884 F.2d 1267, 1269 (9th Cir. 1989) (citing McCollum v. Miller, 695 F.2d 1044, 1047 (7th Cir. 1982)) (emphasis added); see also Docken v. Chase, 393 F.3d 1024, 1028–29 (9th Cir. 2004). Expungement of a disciplinary finding is "likely" to accelerate a prisoner's eligibility for parole when his claim has "a sufficient nexus to the length of imprisonment so as to implicate, but not fall squarely within the 'core' challenges identified [in Preiser]." Docken, 393 F.3d at 1031. According to Preiser, a inmates' claims strike at the core of habeas corpus when they attack "the very duration of their physical confinement itself." 411 U.S. at 487–88. Therefore, a "sufficient nexus," and likewise habeas jurisdiction, exists where a prison inmate "seek[s] only equitable relief in challenging aspects of [his] parole review that . . . *could* potentially affect the duration of [his] confinement." Docken, 393 F.3d at 1031(emphasis added).

As a threshold issue, the court must clarify the proper standard to be applied. Respondent cites Ramirez v. Galaza, 334 F.3d 850, 859 (9th Cir. 2003), for the proposition that habeas jurisdiction is only proper when seeking expungement of a prison disciplinary finding "where a challenge to prison conditions would, if successful, necessarily accelerate the prisoner's release." In Ramirez, a California state prisoner brought a civil rights action under 42 U.S.C. section 1983 seeking damages, declaratory relief and injunctive relief. Id. at 853. The petitioner's complaint alleged that the procedures of his prison disciplinary hearing and the term of his administrative segregation violated his constitutional rights. Id. at 852. The district court dismissed both claims. Id. The Ninth Circuit reversed, holding that an inmate can "challenge the conditions of his confinement under § 1983 [where] his claim, if successful, would not necessarily invalidate a disciplinary action that affects the fact or length of his confinement." Id. In dicta, the Ramirez court suggested that its holding "also clarifies our prior decisions addressing the availability of habeas corpus to challenge the conditions of imprisonment." Id. at 858. To that end, the court suggested

that "habeas jurisdiction is absent . . . where a successful challenge to a prison condition will not necessarily shorten the prisoner's sentence." Id. at 859.

A year later, in Docken v. Chase, the Ninth Circuit again addressed the habeas and section 1983 distinction. 393 F.3d at 1031. The prison inmate in Docken filed a habeas action arguing, *inter alia*, that the parole board violated his constitutional rights by changing the period between his parole reviews from one year to five years. Id. at 1025–26. The district court dismissed the claim without prejudice reasoning that parole eligibility claims, unlike parole decision claims, could only be brought under 28 U.S.C. section 1983 because even if the prisoner's "claim succeeded, he would not be entitled to release." Id. at 1026. The Ninth Circuit reversed, holding that habeas jurisdiction exists "when prison inmates seek only equitable relief in challenging aspects of their parole review that, so long as they prevail, *could* potentially affect the duration of their confinement . . . ." Id. at 1031 (emphasis added). The court explained that even though parole eligibility claims "may not be the kind of 'core' challenge the Preiser Court had in mind, the potential relationship between [such claims] and the duration of [a prisoner's] confinement is undeniable." Id. The court concluded by stating that "we are reluctant to unnecessarily constrain our jurisdiction to entertain habeas petitions absent clear indicia of congressional intent." Id. (citations omitted).

Docken distinguished Ramirez on other grounds. The Docken court explained, "[u]nlike this case, Ramirez concerned a challenge to internal disciplinary procedures and the administrative segregation that resulted from it. Ramirez's suit did not deal with the fact or duration of his confinement." 393 F.3d at 1030 n.4. However, a challenge to internal disciplinary procedures may implicate "the fact or duration of [an inmates'] confinement." Preiser, 411 U.S. at 489. Prison disciplinary hearings may have potential consequences upon parole decisions involving the fact or duration of confinement. This is particularly true because these hearings must comport with certain minimum due process standards. See Wolff v. McDonnell, 418 U.S. 539, 560–74 (1974). Moreover, convictions secured for disciplinary violations in such a proceeding may be a factor in an inmate's parole consideration hearing. Ultimately, such a conviction may well affect the duration of an inmate's confinement and, if so, implicate federal habeas jurisdiction. Docken so suggests. See

393 F.3d at 1031. As in <u>Docken</u>, Murphy's claim is for equitable relief under AEDPA, not damages under 28 U.S.C. section 1983. Accordingly, the standard enunciated in <u>Docken</u> applies here.

Under <u>Docken</u>, the question before the court is whether expungement of Murphy's disciplinary violation is "likely" to accelerate his eligibility for parole, <u>Bostic</u>, 884 F.2d at 1269, or "could potentially affect the duration of his confinement. <u>Docken</u>, 393 F.3d at 1031. As a matter of law, it is well established that a disciplinary violation may affect the duration of an inmate's confinement. Pursuant to CCR section 2402(a), a prisoner that "will pose an unreasonable risk of danger to society if released from prison" is not suitable for release from prison, regardless of the amount of time served. In considering suitability, the Board is required to consider "all relevant, reliable information available," including "involvement in other criminal misconduct which is reliably documented" and "behavior before, during, and after the crime." 15 Cal. Code Regs. § 2402(b). The circumstances tending to show unsuitability include whether "[t]he prisoner has engaged in serious misconduct in prison or jail." <u>Id.</u> § 2402(c)(6). Likewise, institutional behavior is given additional consideration amongst the circumstances tending to show suitability for parole because "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." <u>Id.</u> § 2402(d)(9). The unsuitability and suitability factors are "set forth as general guidelines" to be considered by the parole board. <u>Id.</u> § 2402©, (d).

Murphy's disciplinary violation is precisely the sort of relevant information that section 2402(b) requires parole boards to consider. Murphy's disciplinary violation for attempting to undermine the CCP at the California Men's Colony is "criminal misconduct which is reliably documented." <u>Id.</u> § 2402(b). Moreover, the statute also mandates that the violation be considered because it reflects on Murphy's behavior "after the crime." <u>Id.</u> Thus, Murphy's overall institutional behavior is a double-edged sword that is given consideration as a factor indicating both suitability and unsuitability for parole. <u>Id.</u> § 2402©, (d). Indeed, the disciplinary violation in question here served as a basis for Murphy's denial of parole during his March 2007 hearing, where he was told that the disciplinary violation was "a major concern to this Board." Docket No. 14, Exh. J at 3.

Accordingly, the court finds that expungement of Murphy's prison disciplinary violation, if

10

1   warranted, could affect the duration of his confinement by making it more likely that he would be

2   granted parole. Thus, the court addresses the merits of Murphy's claims.

3

4   II.    Due Process

5           Pursuant to AEDPA, the issues presented are whether the state court's decision was either:

6   (1) contrary to or an unreasonable application of clearly established federal law as determined by the

7   United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of

8   the evidence presented. 28 U.S.C. § 2254(d). The court considers each argument in turn.

9

10          A.     Contrary to or an Unreasonable Application of Clearly Established Federal Law

11          A state court's denial of an application for a writ of habeas corpus is "contrary to" federal

12  law when it "applies a rule that contradicts the governing law set forth in [U.S. Supreme Court]

13  cases" *or* "confronts a set of facts that are materially indistinguishable from a decision of [the U.S.

14  Supreme Court] and nevertheless arrives at a [different result]." Lockyer, 538 U.S. at 73 (citations

15  and internal quotations omitted). On the other hand, a state court's finding is an "unreasonable

16  application" of federal law when it "identifies the correct governing legal principle from [the U.S.

17  Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's

18  case." Id. at 75 (citation and internal quotations omitted). "It is not enough that a federal habeas

19  court, in its independent review of the legal question, is left with a firm conviction that the state

20  court was erroneous." Id. (citations and internal quotations omitted). Instead, a reversal of the state

21  court's determination of a legal question is only appropriate where the state court's application is

22  found to be objectively unreasonable. Id. at 76.

23          Before the Superior Court, Murphy argued that his disciplinary violation should be expunged

24  and the charges dismissed because the Senior Hearing Officer's decision was based on the testimony

25  of unreliable confidential informants. Addressing Murphy's reliability argument, the state court

26  cited the Supreme Court's opinion in Wolff v. McDonnell, 418 U.S. 539 (1974), for the proposition

27  that "punishment of an inmate based on information that is not completely disclosed may occur in

28

prisons." Docket No. 14, Exh. K at 5. In <u>Wolff</u>, the Court established a set of procedural safeguards designed to ensure that prison officials comply with the mandates of due process when conducting prison disciplinary hearings. 418 U.S. at 564–70. One such safeguard was the provision that "there must be a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action." <u>Id.</u> at 564 (citation and internal quotations omitted). Yet, the <u>Wolff</u> Court also warned that "there will be occasions when personal or institutional safety is so implicated that the statement may properly exclude certain items of evidence . . . ." <u>Id.</u> In those circumstances, the Court required that the factfinder's written statement "should indicate the fact of the omission." <u>Id.</u>

In this case, the Superior Court's decision was not contrary to clearly established federal law. First, the record contains no indication, and Murphy has not suggested, that the Superior Court reached a different result than the U.S. Supreme Court did when facing materially indistinguishable facts. <u>Lockyer</u>, 538 U.S. at 73. Second, the Superior Court did not apply <u>Wolff</u> so as to "contradict[] the governing law set forth in [U.S. Supreme Court] cases." <u>Id.</u> Indeed, the Superior Court's decision was entirely consistent with the Supreme Court's holding in <u>Wolff</u> because the Senior Hearing Officer's written statement complied with <u>Wolff</u>'s mandates. The Senior Hearing Officer produced a written statement summarizing the evidence relied upon, including the Rules Violation Report dated January 28, 2002 and the Wiley Report dated January 23, 2002. Docket No. 14, Exh. D at 3. The written statement also explained that the Wiley Report met the requirements for confidentiality because the information "if known to other inmates, could endanger the safety of the confidential informants." <u>Id.</u> The written statement further complied with <u>Wolff</u>'s requirement that the fact of an omission be noted within the report by noting that the evidence relied on included a "Confidential Memo, submitted by Lieutenant M.H. Wiley." <u>Id.</u> The Superior Court applied federal law faithfully and correctly cited <u>Wolff</u> to establish that prison officials are, in appropriate circumstances, permitted to punish an inmate "based on information that is not completely disclosed . . . ." Docket No. 14, Exh. K at 5. Accordingly, the Superior Court's decision was not contrary to clearly established federal law.

The Superior Court's decision also did not involve an unreasonable application of federal

law. As an initial matter, the state court primarily relied on California law, and did not specifically apply Wolff, when determining that the informant's statements were reliable. The state court cited Wolff to establish that the mere usage of confidential information in a prison disciplinary hearing is not a violation of due process. See Docket No. 14, Exh. K at 5. Nevertheless, the Superior Court did not err in the manner described in Lockyer by "identif[ying] the correct governing legal principle . . . but unreasonably appl[ying] that principle to the facts of the prisoner's case." 538 U.S. at 75. The Senior Hearing Officer's written statement explained that the Wiley Report met the requirements for confidentiality because the information, if known to the inmate, could "jeopardize the safety of the informants." Id. at 2. The question, therefore, is whether the Superior Court unreasonably determined that institutional or personal safety was implicated by the confidential information in the Wiley Report.

Based on an *in camera* review of the Wiley Report and in consideration of the Superior Court's analysis, this court cannot conclude that the state court's application was objectively unreasonable. Murphy was convicted of murdering Richard Maher, a partially blind forty-nine year old man who lived alone in his apartment, by strangulation. Ans. at 2. Maher's body was abused and mutilated in what appears to have been a robbery. Docket No. 14, Exh. J at 1–2. While in custody, Murphy's behavior, while commendable in many regards, became erratic after Father Stevenson's arrival. After being denied unsupervised access to the chapel office, Murphy abruptly ended his long association with the CCP. Docket No. 14, Exh. D at 5. For a substantial period of time thereafter, Murphy and the alleged co-conspirators made threatening remarks about Father Stevenson and discouraged other inmates from participating in the CCP. Ans. at 2–3. Based on Murphy's violent history and erratic behavior, the Senior Hearing Officer reasonably determined that Murphy posed a threat to institutional safety and the safety of the unidentified inmate informants. Thus, the Superior Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

B.    Unreasonable Determination of the Facts

In assessing whether there has been an unreasonable determination of the facts, the court will address the following two issues: (1) whether "some evidence" supports the disciplinary board's determination of the facts; and (2) whether that evidence was reliable.

The Supreme Court's decision in Superintendent v. Hill, 472 U.S. 445, 455–56 (1985), provides that "the requirements of due process are satisfied if some evidence supports the decision by [a] prison disciplinary board." This standard is met so long as there is "some evidence from which the conclusion of the administrative tribunal could be deduced . . . ." Id. at 455 (citations omitted). This "some evidence" standard "does not require examination of the record, independent assessment of the credibility of witnesses, or weighing of the evidence" because "the fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." Id. at 455–56.

Some evidence supports the Senior Hearing Officer's determination of the facts. In finding Murphy guilty of attempting to undermine the CCP, the Senior Hearing Officer relied on the information contained in the Wiley Report and the Rules Violation Report. Docket No. 14, Exh. D at 3. After an *in camera* review of the Wiley Report, the Superior Court found that there was "absolutely no question that there was 'some evidence' that . . . [Murphy and the alleged co-conspirators] attempted to weaken Father Stevenson's control by denouncing his programs and making verbal threats that they would 'take him down.'" Docket No. 14, Exh. K at 7. This court agrees. After an *in camera* review of the Wiley Report, this court is satisfied that "some evidence" supports the conclusion reached by the Senior Hearing Officer. Specifically, the Wiley Report contained several firsthand accounts of Murphy's behavior which described how Murphy and the alleged co-conspirators used the chapel as a hangout, denied certain inmates access to the family services program, sold food designated for the family services program on the yard and used the chapel bathroom for trysts with their wives. Ans. at 2–3. The Wiley Report also relates that Murphy and the alleged co-conspirators, as late as December 2001, continued to make threatening statements regarding Father Stevenson while actively discouraging other inmates from participating

1   in the CCP. Id. at 10. The information in the Rules Violation Report supports these findings.

2   Moreover, the above cited evidence is reliable. It is well established that "there must be

3   some indicia of reliability of the information that forms the basis for prison disciplinary actions."

4   Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987). A prison disciplinary committee's reliance on

5   the statements of "an unidentified inmate informant satisfies due process when: (1) the record

6   contains some factual information from which the committee can reasonably conclude that the

7   information was reliable, and (2) the record contains a prison official's affirmative statement that

8   safety considerations prevent the disclosure of the informant's name." Zimmerlee v. Keeney, 831

9   F.2d 183, 186 (9th Cir. 1987).

10   First, the record contains sufficient detail to establish the reliability of the confidential

11   informants. Reliability is established by: (1) oath of the investigating officer; (2) corroborating

12   testimony; (3) a statement on the record by the chairman of the committee indicating that he had

13   firsthand knowledge of the sources of the information and that he considered them reliable based on

14   the informant's record, or (4) in camera review of the documentation from which informant

15   credibility was determined. Id. at 186–87. Here, the reliability of information provided was

16   established in three distinct ways. First, the three unidentified inmate informants who provided most

17   of the information had proven reliable in the past. Ans. at 11. Second, the information provided by

18   these informants was further corroborated by four other confidential sources who independently

19   provided the same information. Id. Third, part of the information provided by these informants was

20   later corroborated by prison officials in an independent investigation of the matter. Id.

21   Upon these facts, the Superior Court determined that the informants' information was

22   reliable. To ascertain the reliability of the informant testimony and the nature of the risk, the

23   Superior Court undertook a sua sponte review of the Wiley Report to assess "whether the hearing

24   officer reasonably could have determined that the information was reliable, and whether the

25   information, if reliable, [was] sufficient to support the guilty finding." Docket No. 14, Exh. K at 6.

26   The Superior Court was persuaded of the veracity of the information documented in the Wiley

27   Report. The court noted that Lieutenant Wiley interviewed seven inmate witnesses and one staff

28

15

witness in addition to Father Stevenson and the four accused inmates. Id. Lieutenant Wiley, the court also noted, memorialized his findings in a fifteen page, single spaced, type written report. Id. Lastly, the court recognized that all eight nonparty witnesses provided some firsthand information. Id. This court is convinced by the Superior Court's rationale that found the Senior Hearing Officer's reliance on the unidentified informants to be reasonable. Accordingly, the first prong of Zimmerlee is met.

To comply with the mandates of due process, however, the prison officials were also required to meet the second prong of Zimmerlee by making an affirmative statement that safety considerations prevented disclosure. The Rules Violation Report explained that the prison's "investigation included information from confidential informant[s]." Docket No. 14, Exh. D at 2. The Report described how the information met "the criteria for reliability per [CCR] Section 3321(c) . . . ." Id. It explains that the confidential information couldn't be provided to Murphy because "to do so may jeopardize the safety of the informants." Id. The Report was signed by Lieutenant Wiley. Id. Thus, Zimmerlee's second prong is met.

Both prongs of Zimmerlee have been met; the information provided by the undisclosed informants was reliable. Accordingly, having determined that some evidence supports the state court's adjudication of Murphy's petition and that the evidence relied upon satisfies all the requirements of due process, this court is satisfied that the Superior Court's denial of Murphy's petition for a writ of habeas corpus was proper. In sum, Murphy has failed to establish his entitlement to relief under either section 2254(d)(1) or 2254(d)(2).

CONCLUSION

For the foregoing reasons the petition for a writ of habeas corpus is DENIED.

IT IS SO ORDERED.

Dated: January 7, 2007

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

16

**ENDNOTES**

1.      Unless otherwise noted, all facts are taken from Murphy's petition.

2.      For purposes of brevity, the court will refer to the group of inmates encompassing David Dutra, James Marvin, Benny Ros, and Gerald Shil as Murphy's "alleged co-conspirators." This usage, however, is not intended to be suggestive of the ultimate legal questions at issue in this petition.

3.      Murphy asserts that his regulatory and statutory due process protections were abrogated when he was: (1) deprived of his right to present requested witnesses who would have provided exculpatory evidence; (2) deprived of his right to receive copies of crucial non-confidential documents that were to be relied on by the Hearing Officer; (3) deprived of effective assistance of the investigative employee; and (4) not informed of crucial facts explaining the "when, where, and to whom" of the alleged misconduct or what statements or actions constituted it. Pet. at 2. Not all of these claims were exhausted before the state courts. Consequently, like the Superior Court, this court addresses only claims that petitioner has exhausted.